**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES ex rel. PATRICK SYKES (#B30637), | ) ) ) | |
| Petitioner, | ) ) | Case No. 05 C 0050 |
| v. | ) ) | |
| GUY PIERCE, Warden, Pontiac Correctional Center, | ) ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge:

Before the Court is Petitioner Patrick Sykes' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d)(1). For the reasons discussed below, the Court denies Sykes' habeas petition.

## BACKGROUND

Sykes does not set forth clear and convincing evidence challenging the statement of facts in the Illinois Appellate Court's opinion affirming the judgment of the Circuit Court of Cook County.[1] As such, the Court presumes that the Illinois Appellate Court's facts are correct for purposes of Sykes' habeas petition. *See* 28 U.S.C. § 2254(e)(1); *Barrow v. Uchtman*, 398 F.3d 597, 603 (7th Cir. 2005). The Court, therefore, adopts the underlying facts set forth by the Illinois Appellate Court, First Judicial District. *See People v. Sykes,* 341 Ill.App.3d 950, 276 Ill.Dec. 57, 793 N.E.2d 816 (Ill.App.Ct. 2003).

---

[1] Sykes recitation of facts is supported by trial testimony, especially his own testimony, which the Illinois Appellate Court discusses in detail in its opinion affirming his conviction and sentence.

## I. Factual Background

### A. The Crime

At approximately 10:25 a.m. on January 9, 1997, a Chicago Housing Authority ("CHA") maintenance worker, Tarie Miller, found a young girl, later identified as Girl X, on the landing of the seventh floor stairwell at the Cabrini Green housing project in Chicago, Illinois. Girl X had been raped, strangled, and then left unconscious in the stairwell. Miller went to apartments 709 and 710 to see if anyone could identify the girl. Two separate women responded and recognized Girl X. They took Girl X to one of the apartments and put her on the couch. At that time, Girl X was unresponsive, foaming at the mouth, and her eyes were rolled back in her head. Her pants were unfastened, her underclothes were down around her ankles, her T-shirt was tied around her neck, and there was blood on her shirt. She was not wearing any shoes and there were what appeared to be gang signs written on her stomach in blue or black marker. Miller and the two women immediately called 911.

The paramedics responded within minutes. When the paramedics arrived, they saw Girl X lying on the couch, breathing erratically, and foaming at the mouth. They also saw red marks on her neck. Thereafter, they transported her to Children's Memorial Hospital. When she arrived in the emergency room, Girl X was comatose, barely breathing, and unresponsive to pain or other stimuli. The doctors noted linear red marks on her neck and red dots that were indicative of strangulation. When they cut off Girl X's clothing, the doctors saw marks on her abdomen and clotted blood obscuring her hymen. Girl X also had several fresh puncture wounds, abrasions, and lacerations on her back. Because Girl X was having trouble breathing and had blood in her mouth, the doctors suctioned out her mouth. Girl X showed signs of severe

brain injury, thus the doctors ordered CT scans for her head and abdomen. The doctors also collected a sexual assault evidence kit. The sexual assault examination revealed no semen on any swabs or on Girl X's clothes and no debris in the fingernail scrapings, although some hairs and hair fragments were recovered from Girl X's clothing. They then admitted her to the pediatric intensive care unit ("ICU").

Dr. Emalee Flaherty, an expert in child sexual abuse, examined Girl X. The examination revealed bleeding in the genital area, lacerations and trauma to the anal area, and a laceration completely through her hymen. Dr. Flaherty concluded that Girl X had been sexually abused and that there had been both vaginal and anal penetration.

While in the pediatric ICU, Girl X was hooked up to a nasal gastric drainage tube to empty the contents of her stomach and to prevent the contents from going into her lungs. Early on January 10, a nurse noticed a strange odor coming from the discharge tube and immediately notified a doctor. The doctor inspected the tube and smelled gasoline or something similar. The hospital notified the police and the police asked the doctor to collect a specimen of the discharge in a glass container, which he subsequently turned over to the police.

### B.     Initial Police Investigation

The police immediately began investigating the crime by canvassing the residents of the CHA building where Miller found Girl X. That day, a police detective spoke with Sykes, who lived in apartment 504. Sykes said that he had returned home around noon and had not seen or heard anything unusual. The detective noted that Sykes did not appear agitated or nervous and did nothing to arouse his suspicion.

Meanwhile, the detective was looking for a pair of shoes because Girl X was not wearing

shoes when she was found.  A boot was found sitting on top of a brown paper bag in the incinerator room on the first floor of the CHA building.  Another boot was found in the incinerator room in a dumpster.  Subsequently, the police identified the boots as belonging to Girl X.  The boots and paper bag were removed and the evidence technicians inventoried them.

The next day, an Illinois State Police latent fingerprint examiner tested the brown paper bag.  She did not find any suitable print impressions on any of the paper items in the bag, but she did find one suitable palm print on a plastic bag that she photographed.  That print was subsequently compared to palm print impressions given by Sykes and another man, James Alexander, but no matches were made.

Also in January 1997, the Illinois State Police lab examined the brown paper bag for bloodstains.  They found numerous stains on the outside of the bag.  A stain on the corner of the bag was determined to be human blood, while a stain in the center of the bag was not human blood.  The crime lab tested for genetic markers, but the test was inconclusive.  Also, the crime lab examined Girl X's clothes and found that her T-shirt was stained with her own blood and that James Alexander's blood was not a match.  Her clothing was also stained with feces.

The evidence technicians photographed the area where Miller found Girl X.  The technicians recovered various pieces of evidence, including markers found in the elevator area and five plastic jugs filled with different liquids which they found in the upper shaft of the elevator.  The crime lab examined the markers on January 10, 1997, but did not find fingerprints.

A chemist in the crime lab analyzed Girl X's stomach contents.  He found medium petroleum distillate-type chemicals and a small amount of heavy distillate.  The chemist also analyzed the contents of the five jugs.  Four of the five samples were clearly different in pattern

from the stomach contents, while the fifth had medium distillate in the same range as the stomach contents, but no heavy petroleum distillates.

On January 10, 1997, the police canvassed the CHA building again. At that time, another detective interviewed Sykes in apartment 504. Sykes said that he left his apartment at 8:10 a.m. on January 9 and saw James Alexander in the hallway, who asked him where "Eddie" lived. Mary Johnson of apartment 710 also saw Alexander around 10 a.m. when he knocked on her door and asked her where Eddie Adams lived. Meanwhile, the police noticed that apartment 205 was vacant but not boarded up.

Detectives William Calabrese and John Brock were the lead detectives in the matter. After speaking with Alexander, they spoke with Sykes on January 9 or 10, at which time they asked him if he knew what had happened. Initially, Sykes stated that he was not around, but later stated that he saw Alexander in the fifth floor hallway, and that Alexander had asked him if he knew where Eddie was. Sykes also told the detectives that Alexander asked him if he knew anything about a television, to which Sykes responded that he did not.

In total, approximately 125 police officers worked on the Girl X case. The police compiled a list of suspects that eventually contained 37 names, but Sykes was not on that list. There was no "number one" suspect at that time because almost every man and some of the women in the building were considered suspects. Possible gang involvement was investigated, but the police never established a connection.

The police interviewed James Alexander, who was on the suspect list. Alexander, who was known as "raper man" in the building, lived in apartment 608, which the police searched. The police found blood on the back door that was consistent with Alexander's blood type, but

not with Girl X's.  A mop head was also tested, but the police found no blood on it. Alexander's red shorts were analyzed on January 13, and semen stains were found, but no vaginal secretions were present.  Initially, Alexander did not tell the police that the paper bag found under Girl X's boot was his.  Subsequent police general progress reports, however, indicated that Alexander admitted that the bag was his and that he had thrown it away on January 9.  In the interim, the police took Alexander to the police station and interviewed him.  The police ruled him out as a suspect by March 31, 1997, because the police had no evidence linking him to the crime.

In the middle of March 1997, another team of detectives in the intelligence section of the organized crime unit assisted in the Girl X investigation.  The new team included Detectives John McHugh and Fred Wheat, among others.  The detectives first reviewed the previously generated reports.  They noted inconsistencies in Sykes' statements during the initial canvass with respect to whether he saw Alexander on the day of the crime.  At that time, Alexander was a primary suspect and Sykes was a possible witness against him.

Detective Wheat then went to apartment 504 at Cabrini Green to find Sykes.  He spoke to Sykes' former girlfriend, Tina Stokes, who told the detective that Sykes did not live with her any more.  She gave the detective an address at 3223 W. Maypole Avenue, Chicago, Illinois, where Sykes might be found.  The officers went to that address to look for Sykes, and Elaine Townsel told them that Sykes was living with her and that he would be back early the next day.  That night, Townsel told Sykes that the police had been by, and Sykes told her that he was a witness in the Girl X rape case.

The officers returned early the next morning and saw Sykes walking with Townsel and

her children.  An officer spoke with Sykes for a few minutes before Detective Wheat arrived.

Detective Wheat introduced himself to Sykes and told him that there were some inconsistencies

in his statements concerning Alexander that needed clearing up.  Sykes knew it concerned the

Girl X case.  Detective Wheat asked Sykes to come to Area 3 to speak with him and told him

that he could take a bus, get a ride, or ride with him to the station.  Sykes chose to ride with

Detective Wheat because he did not have money for a bus.  Sykes then rode to the police station

in the front passenger seat of Detective Wheat's car.  At that time, the police did not handcuff

him, pat him down, or touch him in any way.

### C.  Initial Police Interviews

At Area 3, Sykes first sat in the squad room area on the second floor where officers and

civilians were milling around.  At 9:30 that morning, Detectives Wheat and Calabrese began to

talk to Sykes in a second floor interview room.  At all times during the interview, the door was

open.  Detective Wheat advised Sykes of his *Miranda* rights.  Sykes stated that he understood

those rights and told Detective Calabrese that he was an epileptic, that he was on medication, and

that he had taken a pill that morning.  Sykes also said that he got his medication by using a card,

which he gave to Detective Calabrese.  Detective Calabrese gave the card to Detective McHugh

who obtained the medication in the afternoon and gave it to Sykes.

During the first interview, Sykes said that on the day of the incident, he left his CHA

building at 7:15 a.m. to walk Tina Stokes to the bus stop.  At 7:30 or 7:40 a.m., he returned to

the building, where he saw Alexander and a sleeping security guard in the lobby.  Then, at 7:45

a.m., Alexander came to Sykes' door looking for "Eddie."  Five minutes later, Sykes left the

building to buy food and cigarettes.  At approximately 8:15 a.m., he returned to his apartment

and went to apartment 509 to inquire about a television that was for sale. He then saw Alexander on the fifth floor. Around 10 a.m., Sykes left the building to go sign in at the Safer Foundation. He then met Stokes downtown for lunch. Further, he stated that he spent the rest of the afternoon looking for a job. Later that day, he returned home with Stokes. Finally, he told the detectives that he was uncertain as to whether he knew Girl X, but he may have drawn her a picture at one time.

After the interview, the police asked Sykes to sign consent forms to give handwriting and hair samples, which he did. After the hair collection process, everyone left the interview room. Sykes went to the bathroom, got something to drink, and took a cigarette break. No police officer was with Sykes during this time. The police allowed him to walk freely about the area.

At approximately 1:30 p.m. that same day, Sykes gave a handwriting sample to Detective Calabrese in the squad room. After Sykes gave the sample, Detective Calabrese ordered lunch for Sykes. During that process, Sykes said that he done the test in an earlier case, but Detective Calabrese did not know whether he was referring to the hair test or the handwriting test. Sykes talked about his two earlier cases.

Detective Calabrese commenced a second interview at 2:30 p.m. During this interview, Detective Calabrese showed Sykes the sign-in sheets for the Safer Foundation from January 9. The sign-in sheets indicated that Sykes had not signed in that day. Sykes then stated that he did not know where he was at 8:30 a.m. on January 9, but he did remember having lunch with his girlfriend, Tina Stokes, that day. He also stated that he wrote down his whereabouts on January 9 and put the paper in Townsel's apartment because he knew that the police would question him. After these statements, Sykes spent the next two hours in the interview room, where he was free

to use the bathroom and get water, which he did a few times. The police did not ask him any questions during this time period.

At 5 p.m., after the detectives advised him of his *Miranda* rights, Sykes spoke to Detectives Brock and Calabrese for approximately 20 minutes. Sykes stated that he was confused about the Safer Foundation records and about coming home with his girlfriend on January 9. He said that when he returned from looking for a job downtown on the morning of January 9, he saw a television truck outside and learned of the Girl X crime. Further, he stated that the piece of paper at Townsel's apartment pertained to his activities on January 10, not January 9. Sykes subsequently agreed to take a polygraph examination, and Detectives Wheat and McHugh drove him to 11th and State at approximately 6:30 p.m.

Officer Tovar administered the polygraph examination. Prior to the examination, Sykes signed a consent form and a *Miranda* waiver. Officer Tovar then interviewed Sykes about his background. During the examination, Officer Tovar asked Sykes about Girl X and determined that Sykes was being deceptive. After the examination, Officer Tovar informed the detectives that he detected deception in Sykes' polygraph examination. The police then took Sykes back to Area 3 shortly before 10 p.m. At 11:30 p.m., the detectives advised Sykes of his *Miranda* rights again and told him that Officer Tovar had detected deception on his polygraph examination. They did not ask Sykes if he were involved in the crime.

At 2:30 a.m., Detectives Wheat and McHugh began another 40 minute interview with Sykes. First they discussed sports and Sykes' prior cases before talking about the Girl X case. Detective Wheat told Sykes that his alibi had fallen apart because the Safer Foundation records did not match his story. Shortly thereafter, Detective Wheat left the room to tell Detective

9

Calabrese that Sykes was confessing to the crime.

### D.    Sykes' First Statement

Detective Wheat went back to the room, and Sykes relayed the following verbal statement:   On January 9, 1997, Sykes heard a knock on the door, and when he opened the door, a little girl was standing there.  She told him that she was being followed and that she was scared.  Sykes let her into the apartment.  Because the girl did not want to go to school, Sykes let her stay.  They both sat on the couch, and Sykes turned on the television.  The girl began to touch Sykes, and he touched her.  The television was knocked over and Sykes asked the girl to leave because he was afraid.  The girl said she would tell people what he had done to her if she were not allowed to stay.

Sykes further stated that he then went to the bathroom, and when he returned, the girl had removed her shirt.  He sat down next to her on the couch, and they began touching each other. She took Sykes' hand and placed it between her legs.  Again, Sykes told her she would have to leave and that he was afraid that he would get into trouble.  He went to the bathroom again, and when he returned, the girl had removed the remainder of her clothing.  Sykes again tried to make her leave, but she said that she would go to the window and scream.  They sat on the couch again.  Sykes inserted his finger into the girl's vagina and moved it around, at which point she began to move with him.  He then put his finger into her rectum for a minute or so. The girl asked him to take out his penis so she could touch it.  He took out his penis, and the girl sucked on it for about a minute when Sykes stopped her and told her that she had to go.

The girl began to scream.  Sykes put his hand over her mouth to stop her.  When she did not stop, Sykes began choking her.  After awhile, the girl lay lifeless, and he tried to dress her.

The girl regained consciousness and began screaming again, so Sykes choked her until she was unconscious again. He finished dressing her and put her over his shoulder and took her from the apartment up a couple of floors and placed her on the landing. He took a marker and drew a pitchfork, the letters "GD," and some other letters on her stomach. Also, he put her shoes on her stomach. Sykes left the girl, went down to an apartment on the second floor, and got a can. He then went back upstairs and sprayed fluid from the can into her mouth. He discarded the can in the second floor apartment.

### E.    Sykes' Additional Statement

Shortly thereafter at approximately 3:15 a.m., Detective Calabrese joined Detectives Wheat and McHugh to interview Sykes. Again, they advised Sykes of his *Miranda* rights. Sykes then repeated the statement where he stated that he was the perpetrator of the crime. The interview lasted about 45 minutes, after which the officers left him in the room with the door open. Sykes motioned for Detective McHugh to come back and told the detective that he had lied about a few things in his previous statement. He then stated that he grabbed the girl and pushed her into the apartment. Sykes further said that she had "messed" on herself, and that he threw her shoes down the garbage chute. The police then asked Sykes if he needed anything and gave him a blanket and some cigarettes. At that time, the police locked Sykes in the interview room for the first time.

At 8:30 a.m., Detective Brian Killacky introduced himself to Sykes and gave him food, something to drink, and cigarettes. At 11:15 a.m., Detectives Killacky and Wheat went to the conference room and again advised Sykes of his *Miranda* rights, which he said he understood. Sykes then ate some pizza and discussed the case with the detectives for about 20 to 25 minutes.

Sykes said that he was 25 years old and lived in apartment 504 at the time of the crime. On the morning of the crime, he walked his girlfriend to the bus stop. He returned to the fifth floor of the building and saw a young girl walking up the stairs. He grabbed the girl and took her into his apartment and closed the door. He pulled the girl's pants off and inserted his right index finger into her vagina and rectum. He then became sexually aroused and the girl began to cry. Sykes unzipped his pants and unsuccessfully attempted to put his penis into her vagina. He insisted that she open her mouth, and he placed his penis in her mouth for a minute or two. The girl began to scream and cry. Sykes then put his hands around her throat and began to choke her. He smelled and then observed feces on the girl.

Sykes then walked to the front door, looked out, pulled up the girl's pants, and then carried her upstairs. He took a marker he had found and wrote "TWS," "GD," and drew a pitchfork on her stomach. He further stated that he went downstairs to an abandoned apartment and got a red and white can of TAC or TAT roach spray. He went upstairs and sprayed the can's contents into the girl's mouth and she started spitting up. Sykes then left her. On the way back to his apartment, Sykes ran into Alexander. After returning to his apartment, Sykes noticed that he had left the girl's boots there, so he took them out, but did not remember where he put them. He went back to his apartment, and it was at that time that Alexander knocked on the door. After that, Sykes changed his clothes. After he made this statement, Sykes had cigarettes and a soda. The detectives left to notify felony review.

At 12:15 p.m. Detectives Wheat and Killacky spoke to Sykes and asked him why he sprayed the roach spray into the girl's mouth. Sykes said that he thought he had leaked or ejaculated into her mouth. The reason he wrote on her stomach was because he had seen similar

writing at Cabrini Green. He also told them that he put the spray can in an abandoned apartment immediately off of the stairwell on the second floor.

Sometime after noon, Assistant State's Attorney (ASA) Robert Buckley arrived at Area 3 to assist the detectives with the preparation of search warrants. At 3:30 p.m., Detectives Killacky, Wheat, and ASA Buckley interviewed Sykes in a large conference room. After ASA Buckley advised Sykes of his *Miranda* rights, a 30 to 45 minute conversation took place. At approximately the same time, other detectives went to Cabrini Green to look for the can of roach spray. They went to apartment 205 and found a red can with TAT written on it.

At approximately 6:30 p.m., Sykes identified the can of roach spray that he used to spray down the girl's throat. Shortly after midnight, ASA Buckley had a conversation with Sykes alone. ASA Buckley asked Sykes how the police had treated him. Sykes told ASA Buckley that he had been allowed to use the bathroom, smoke, drink, eat, and sleep. Sykes also stated that the detectives allowed him to take his epilepsy medication and that he was not under the influence of alcohol or any other drugs. ASA Buckley asked Sykes if he needed anything else and if he wanted to document his statement. Sykes elected to make a handwritten statement.

Early the next morning at 1.a.m., ASA Buckley wrote out Sykes' statement. Sykes signed the rights waiver contained in the statement. This process lasted approximately 40 minutes, during which the police took a picture of Sykes, and Sykes identified pictures of the can of roach spray and of Girl X.

### F.     Sykes' Handwritten Statement

In his handwritten statement, Sykes stated that he was 25 years old and that his date of birth was January 23, 1971. On January 9, 1997, Sykes lived with his girlfriend, Tina Stokes, in

apartment 504 at Cabrini Green.  That morning, Sykes walked Stokes to the bus stop and then he returned to their apartment.  He was standing on the porch when he saw Girl X walking up the stairs wearing a pair of pants and a white shirt.  He grabbed her and pulled her into the apartment and locked the door.  He took her to the couch in the front room, pulled her pants down, and put his right index finger into her vagina and rectum.  He got an erection and tried to put his penis into the girl's vagina, but she began crying.  Tears were coming from her eyes, and she was whimpering, but then stopped.  Sykes then put his penis into the girl's mouth. The girl sucked on his penis for about a minute and then she began screaming.  He did not want her to scream, so he put his hand over her mouth.  He then put his hands around her neck and began choking her.  As Sykes choked her, he smelled and saw feces coming out of her.  He choked her for awhile, and then she stopped screaming.

Girl X was still breathing and it appeared as though she was sleeping.  Sykes set her down on the floor in the front room and pulled up her pants.  He then walked to the front door and looked out.  When he did not see anyone, he put Girl X over his shoulder and carried her to the stairwell between the sixth and seventh floors.  Thereafter, he set her down and took a marker and wrote "TWS," "GD," and drew a pitchfork on her stomach.  He stated that he was not a member of a gang and did not know what the letters meant.

Sykes further stated that he went downstairs to an abandoned apartment on the second floor to look for something to spray into the girl's mouth because he was afraid that he had left something in her mouth when he removed his penis.  He found a red and white can of TAC or TAT, which he took back to where the girl was lying.  He put the tube into her mouth and pushed the button.  The contents smelled like roach spray.  Girl X began to spit up and some of

the liquid came out of her mouth.  Sykes then left and took the can back downstairs to the vacant second floor apartment.

As he was returning to his apartment, he saw Alexander on the landing.  Back inside the apartment, he noticed that he had forgotten the girl's boots, so he took them up to the sixth floor and threw them in the dumpster.  He then returned to his apartment and changed his clothes.  It was then that Alexander knocked on the door looking for Eddie.  Finally, Sykes threw out the marker near an abandoned CHA building.

At the end of his statement, Sykes said he came to the police station voluntarily with Detective Wheat and that the police and ASA treated him well.  Further, he stated that the police gave him a pizza and a hamburger to eat, soda to drink, and cigarettes to smoke.  They also allowed him to sleep and use the bathroom.  He stated that he took his epilepsy medication.  Last, Sykes expressed remorse for what he had done.

### G.    Sykes' Additional Written Statement

At 3:30 p.m., ASA Buckley had another conversation with Sykes.  ASA Buckley wanted to get more information about where Sykes had obtained the roach spray, about the writing on Girl X's stomach, and how Sykes knew her.  After this conversation, Sykes said he wished to give another written statement.  ASA Buckley wrote the statement and Sykes and the detectives signed it.  This statement was prepared in an administrative office using the same procedures that were used during the taking of the previous handwritten statement.  Sykes also drew a picture of a pitchfork on one of the pages.

In the second written statement, Sykes stated that parts of his prior statement were not true.  He had been afraid of getting Stokes into trouble, so he said that he had gotten the spray

can from the second floor when in fact he had gotten it from a shelf between the bathroom and the bedroom in apartment 504. He then stated that in addition to choking the girl, he put her on the floor and put his foot across her throat. He sprayed the spray into her mouth while they were still in the apartment. Sykes wrote on Girl X's stomach because he wanted it to look like a gang member had done it. He knew that GD stood for Gangster Disciple and that the pitchfork is their symbol. The marker he used was thick, not like the one he used when he drew pictures. He threw the marker near an abandoned CHA building as he walked toward Clark and Division Streets.

Meanwhile, while Sykes was at Area 3, he never asked to make a phone call, to leave, or to see Townsel. The detectives did not verbally or physically abused Sykes nor did they threaten or promise anything in exchange for his statement. He appeared calm and cooperative. He did not exhibit signs of a seizure. Moreover, he did not complain that he had had a seizure. Sykes was alert, talkative, friendly, and coherent and did not appear disoriented. The police did not handcuff him while he was in the interview room.

### H.    Continued Investigation

The next day, the chemist at the crime lab analyzed the contents of the aerosol can of roach spray and recovered medium petroleum distillate and a small amount of heavy petroleum distillate. This extraction was consistent with the stomach contents of Girl X and different from the samples of any of the jugs recovered in the elevator shaft.

Evidence technicians took hair samples from Sykes' head, sideburns, and mustache. The evidence technicians and detectives subsequently gathered debris samples and some bottles from apartment 205. From apartment 504 they recovered a futon mattress, pillows, toiletries, shoes,

boxer shorts, a rug, debris from a closet, some head hairs from Tina Stokes, fibers from a wig, and an envelope. The crime lab tested these items, but no evidence linked Sykes or anyone else to the crime. Further, no evidence linked Girl X to the crime scene.

Thereafter, Sykes was transferred to Cook County Jail where an intake nurse examined him. Sykes told the nurse that he was taking Dilantin and another medication, and that he had taken Dilantin the day before. A blood sample from Sykes indicated a level Dilantin level of .346, with a recommended level being 10 to 20.

## I.      Girl X

 In February 1997, Girl X was transferred to Schwab Rehabilitation Institute, where she began to emerge from her coma. At Schwab, the staff made an effort to ensure a media blackout and to keep information concerning the attack from Girl X. By April 1997, psychologist Carolyn Reeder was able to get Girl X to use a device to register yes and no answers to questions. Girl X was 100 percent accurate in reporting personal information; however, she did not know why she was in the hospital or why she could not see or talk. Also in April, another girl who had been raped gave Girl X a gift. Girl X became upset when she heard the word "rape." Reeder asked her if a man had hurt her, and Girl X responded that she was afraid that he would come back and hurt her again.

Throughout April 1997, Girl X was scared of being alone, had nightmares, was easily startled, and cried a lot. Reeder asked her if it was because of what happened to her, and Girl X responded yes. Reeder told her that the man who hurt her was in jail and could not get out, but did not give her any names or details.

Subsequently, Girl X was discharged from Schwab and went home. One day, Girl X was

crying and screaming, and her mother asked her if she wanted to talk about what happened to her. Reeder had previously told Girl X's mother that Girl X might begin to have memories of the assault. Girl X's mother named all of the men in the building, beginning with the seventh floor and working down. When she got to the fifth floor, Girl X indicated that the man in apartment 504, who liked to draw, was the attacker. Her mother contacted Detective Wheat and told him that he had the right man after all. Prior to that time, Girl X's mother believed that the police had arrested the wrong man.

In September 1998, a school social worker called Girl X's mother and told her that Girl X was relating an account of the attack. Her mother told the social worker to ask Girl X if it was the man who lived across from the incinerator chute who used to draw. Girl X responded that the man grabbed her and forced her into the apartment on the fifth floor across from the incinerator.

Lori Smith, a child abuse specialist for the Cook County State's Attorney's Office, met with Girl X eight times before the trial. Smith did not know any details about the crime when she first met with Girl X. Smith determined that Girl X could tell the truth from a lie. On April 20, 1999, Girl X relayed to Smith that a man on the stairs offered her some fruit and that she went with him to apartment 504. He took her to the bedroom, and she began crying. The man pulled a knife from his shirt and made her "suck dick." At this point, Girl X stopped responding to Smith.

By March 2001, Girl X could communicate using an eye gaze system. Barbara Robinson, an expert in speech pathology, explained the eye gaze system at trial. The eye gaze system is used for people who cannot see or hear and relies on each individual's yes or no

response system.  For Girl X, her eyes would go way up, indicating yes, and for no, she would shake her head and look down.  The alphabet is divided into three blocks:  A-H, I-Q, and R-Z.  The questioner would begin by asking if the letter is in the beginning, middle, or end of the alphabet, then within each block, the questioner goes successively through the letters until a yes response is obtained.

### J.     Girl X's Trial Testimony

Girl X testified at trial using the eye gaze system.  She testified that on the day in question she was walking to her grandmother's apartment.  When she got to the fifth floor, she saw Sykes standing on the landing.  She had seen him before sitting on a crate and drawing pictures.  He asked her if she wanted a banana, and she said yes.  She then followed him to apartment 504 and into the living room.  There was no one else in the apartment.  The man closed the door and stood in front of her.  When he pulled out a pocket knife, she tried to leave, but the door was locked.  The man grabbed her by the arm, and she struggled with him.  They went into the bedroom, and the man told her to get on the bed.  The man touched her vagina with his hands.  She asked him if she could go to school.  The man told her to "suck his dick" and put his penis in her mouth before peeing in her mouth.  He then took his penis out of her mouth and covered her face with blankets.  She could not scream or breathe and did not remember coming out of the room.  Girl X testified that she knew James Alexander who lived on the sixth floor, but he was not the man who did those things to her.

### K.     Sykes' Trial Testimony

At trial, Sykes testified that he was 29 years old and that his date of birth was July 23, 1971.  He stated that he has epileptic seizures and takes Dilantin three times a day.  He also

testified that he had prior convictions for armed robbery and attempted sexual assault. In January 1997, he was living with Tina Stokes in apartment 504 at Cabrini Green across from the incinerator chute. At that time, he did not know Girl X and never belonged to a gang. He testified that he often sat on a crate where children would watch him draw cartoons.

On the morning of January 9, 1997, he walked Stokes to the bus stop and went back to their apartment around 8 a.m. and did not leave again that day. Alexander knocked on the door and asked where Eddie lived. Later that day, a white police officer asked him if he had heard anything and said that a little girl had just been raped. Sykes did not tell him that he had seen Alexander because "when something happens, it's not too healthy to talk to the police."

Sykes further testified that by March 31, 1997, he was living at 3222 W. Maypole Avenue in Chicago, Illinois, with Townsel. On that day, Townsel told him that the police had come by looking for him, and he assumed that it was about being robbed, not about Girl X. The next day, a police officer approached him on the street and said he needed to go to the police station to identify Alexander from a lineup. He went voluntarily to the station and the police did not handcuff him. Sykes testified that at that time he had not eaten nor had he taken his medication. At the station, the police gave him food, beverages, and cigarettes.

In addition, Sykes testified that while he was at Area 3, he did not sleep or take Dilantin. He told the police about his epilepsy and gave Detective McHugh his medical card. Later, Detective McHugh showed him a bottle that he claimed was Dilantin, but Sykes never saw it. Sykes also testified that he was confused about the dates, but never admitted to having anything to do with Girl X.

Furthermore, Sykes testified that he never read the statements which he signed, and that

he signed the papers after he had a seizure. He also stated that he fell on the floor of the holding cell during a seizure and that the detectives picked him up off the floor and splashed cold water on his face. Moreover, the ASA did not read his statement to him, and while he did sign the *Miranda* waiver, someone else signed his name on the other pages of the first statement. In addition, Sykes testified that he did not sign the second statement at all nor did he draw a pitchfork on that statement. He admitted that he was okay when he was speaking to the police officers about the crime, but he had a seizure before he signed the papers. Sykes also testified that he knew what TAT was and that when he arrived at the Cook County Jail, he told the intake nurse that he had taken his medication the day before.

## II.     Procedural Background

The jury convicted Sykes on four counts of predatory criminal sexual assault, attempted first degree murder, and aggravated kidnaping, after which the trial court sentenced him to 120 years in prison. Sykes appealed his conviction and sentence to the Illinois Appellate Court, First District, raising the following arguments: (1) he was deprived his due process rights when the trial court denied his motion to dismiss based upon the State's destruction of potentially exculpatory evidence; (2) the trial court erred in denying his motion to allow a defense expert to conduct a physical and cognitive examination of Girl X; (3) the trial court erred in denying his motion to suppress his two written statements; (4) the trial court erred in denying his motion to bar the State from impeaching him with evidence of a prior conviction; (5) the trial court erred by preventing him from conducting a cross-examination of certain witnesses; (6) the trial court erred in admitting certain photographs into evidence; and (7) the State did not prove him guilty beyond a reasonable doubt. (R. 18-1, Respondent's Rule 5 Exhibits, Ex. A.) On June 30, 2003,

the Illinois Appellate Court affirmed Sykes' conviction and sentence. (Ex. D.)

Sykes then filed a petition for leave to appeal to the Illinois Supreme Court raising the same issues presented on direct appeal. (Ex. E.) On October 7, 2003, the Illinois Supreme Court denied Sykes' petition for leave to appeal. (Ex. F.) Sykes did not file a petition for writ of certiorari to the United States Supreme Court. Also, Sykes did not file a petition for post-conviction relief under the Illinois Post Conviction Hearing Act, 725 ILCS 5/122-1 *et seq.*

On January 4, 2005, Sykes filed the present petition for habeas corpus relief pursuant to 28 U.S.C. § 2254(d)(1). Sykes presents the following constitutional claims in his habeas petition: (1) the Illinois Appellate Court unreasonably applied United States Supreme Court precedent in concluding that his confessions were voluntary; (2) the Chicago Police Department's destruction of five lots of evidence denied him his right to due process; (3) the trial court's denial of his request for a defense expert to conduct a pre-trial physical and cognitive examination of Girl X violated his Sixth Amendment rights; and (4) the Illinois Appellate Court unreasonably applied United States Supreme Court precedent when concluding that his conviction was supported by sufficient evidence.

**LEGAL STANDARD**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief cannot be granted unless the state court's decision was (1) contrary to, or an unreasonable application of law clearly established by the Supreme Court or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005) (citing 28 U.S.C. § 2254(d)(1-2)); *see also Williams v. Taylor,* 529 U.S. 362, 402-03, 120 S.Ct. 1495, 146 L.Ed.2d

389 (2000). In *Williams*, the Supreme Court explained that a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Id.* at 405; *see also Brown v. Payton,* ___U.S.___, 125 S.Ct. 1432, 1438-39, 161 L.Ed.2d 334 (2005).

Under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See Williams*, 529 U.S. at 407. "This reasonableness determination is quite deferential, such that a state decision may stand as long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect." *Barrow,* 398 F.3d at 602; *see also Yarborough v. Alvarado*, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (state court decision must be objectively unreasonable).

The *Yarborough* Court explained the reasonableness determination under Section 2254(d):

> The range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Id.* at 664.

The Seventh Circuit also lends guidance concerning the reasonableness standard. To be considered "unreasonable," a state court's decision must lie "well outside the boundaries of

permissible differences of opinion." *Hardaway v. Young,* 302 F.3d 757, 762 (7ᵗʰ Cir. 2002); *see also Hubanks v. Frank*, 392 F.3d 926, 929 (7ᵗʰ Cir. 2004) (to be reasonable, state court decision must be minimally consistent with facts and circumstances of case or one of several equally plausible outcomes).

## ANALYSIS

**I.      Claim 1   – Voluntariness of Confessions**

In his first habeas claim, Sykes contends that the Illinois Appellate Court unreasonably applied United States Supreme Court precedent in concluding that he gave his confessions voluntarily and that the Illinois court's determination was contrary to clearly established Supreme Court precedent.  The requirement that a confession must be voluntary in order for a court to admit it into evidence has two constitutional bases – the Fifth Amendment right against self-incrimination and the Fourteenth Amendment's due process clause.  *Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).  When evaluating the voluntariness of a statement, courts examine the totality of the circumstances surrounding the police interrogation.  *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).  The totality of the circumstances determination involves the "weighing of the circumstances of pressure against the power of resistance of the person confessing."  *Dickerson,* 530 U.S. at 434 (citation omitted).  In applying this test, courts consider many factors, including, but not limited to:  (1) whether the police read the defendant his *Miranda* rights; (2) the defendant's characteristics, such as age, mental state, and intelligence level; (3) the conditions of the interrogation, including duration, access to the bathroom and food, and the general environment; and (4) the police officers' conduct.  *Conner v. McBride,* 375 F.3d 643, 651 (7ᵗʰ

Cir. 2004) (citing *Schneckloth,* 412 U.S. at 226).

### A.      Unreasonable Application of Supreme Court Precedent

Sykes argues that the Illinois Appellate Court unreasonably applied Supreme Court

precedent when determining that his confessions were voluntary.  Specifically, Sykes contends

that despite the requirement that courts look to the totality of the circumstances when

determining whether a confession is voluntary, the Illinois Appellate Court took only one factor

into consideration, namely, the length of his detention.

When evaluating his claim, the Illinois Supreme Court stated the following:

> Turning to the facts of this case, we conclude that the totality of the
> circumstances indicates that defendant's confession was voluntary.  The evidence
> at the hearing established that, contrary to defendant's assertions on appeal, he
> was not in "detention" for 56 hours.  On the contrary, he was at the police station
> for 18 ½ hours before he made the incriminating statements.  There were
> interviews, tests, and samples taken, and defendant was transported to 11th and
> State Street, where other tests were performed.  Moreover, defendant was initially
> present at the police station as a witness and was allowed to move freely about the
> station during his interview.  The trial court found that the mere fact that
> defendant was given his *Miranda* warnings before the initial interview did not
> indicate that he was in custody at that point.  The trial court specifically found,
> and we agree, that defendant was in custody only after his alibi was refuted and
> defendant made inculpatory statements.  Those findings are clearly supported by
> the record and are not against the manifest weight of the evidence.  We conclude
> that defendant's statements were made voluntarily and that he was not coerced
> into making the inculpatory statements.  Accordingly, the trial court did not err by
> denying defendant's motion to quash his arrest and suppress evidence.

*People v. Sykes*, 341 Ill.App.3d at 975.

Contrary to Sykes' assertion, the Illinois Appellate Court considered more than the length

of his detention when making its determination, including that Sykes was free to move about the

station during his interview, the police gave him *Miranda* warnings, the police only took Sykes

into custody after his alibi was refuted and he made inculpatory statements, and the police did

not coerce him into making the inculpatory statements. These factual determinations demonstrate that the Illinois court weighed and evaluated the totality of the circumstances. *See, e.g., Conner,* 375 F.3d at 651. Further, the United States Supreme Court has held that "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *see also Conner,* 375 F.3d at 651 (police coercion necessary predicate in finding involuntariness). Here, the Illinois Appellate Court unequivocally concluded that the police did not coerce Sykes into making his inculpatory statements.

In any event, even if the Illinois court's determination were in error, its decision is not objectively unreasonable. *See Yarborough,* 541 U.S. at 665. In other words, the Illinois Appellate Court's decision is minimally consistent with facts and circumstances of this case. *See Hubanks*, 392 F.3d at 929; *see also Conner,* 375 F.3d at 651 (as long as decision is within the boundaries of permissible differences of legal opinion, there is no basis to deem it unconstitutional). More specifically, the evidence in the record shows that the police gave Sykes his *Miranda* warnings on multiple occasions and he signed a written waiver of his rights; Sykes was free to move about the police station, including going to the bathroom; the police treated Sykes well and did not coerce Sykes into making his statements; and Sykes was approximately 25 years old when he gave the incriminating statements. *See Conner,* 375 F.3d at 651. The evidence in the record also indicates that the police provide Sykes with food, drinks, a blanket, and cigarettes, and that Sykes had the opportunity to sleep. *See id.* Therefore, Sykes' claim that the Illinois Appellate Court unreasonably applied the totality of the circumstances test fails.

### B.    Contrary to Clearly Established Supreme Court Precedent

Next, Sykes argues that the Illinois Appellate Court's conclusion that his statements were voluntarily is contrary to *Watts v. Indiana,* 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801(1949). Sykes contends that the facts in his case are materially indistinguishable from *Watts*, yet the Illinois court came to the opposite result.   *See Williams,* 529 U.S. at 405 (decision contrary to Supreme Court precedent "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours").

In *Watts*, the police detained the defendant for six days in which the police persistently questioned him and did not advise him of his constitutional right to remain silent.  *Id*. at 52-53. On the first two days, the police kept the defendant in solitary confinement in a cell known as "the hole," where there was no place to sit or sleep except the floor.  *Id*. at 53, 56.  During the following days, the police drove the defendant around town, hours at a time, to elicit identifications and other information.  *Id.* at 53.  Further, the defendant did not have counsel during his six day detention.  *Id.*  Based on these facts, the Supreme Court concluded that the police conducted a "calculated endeavor to secure a confession through the pressure of unrelenting interrogation."  *Id.* at 54.

Sykes' attempt to portray the facts of his case as materially indistinguishable from *Watts* is disingenuous.  Here, the Chicago police did not confine Sykes to solitary confinement for two days and interrogate him for six days without informing him of his right to remain silent. Instead, the police gave Sykes *Miranda* warnings on numerous occasions and Sykes made his first incriminating statement approximately 18 hours after he came to the police station as a witness.  As mentioned, evidence in the record reveals that Sykes slept during his detention and

that the police provided him food, drinks, a blanket, and cigarettes. Until his confession, the police kept the interrogation room open and allowed Sykes to walk freely about the area. Although Sykes did not have counsel present, this fact alone does not make his case "materially indistinguishable" from *Watts*, especially because Sykes does not claim that he requested counsel nor does the record reflect such a request. Accordingly, the facts in Sykes' case are not "materially indistinguishable" from *Watts*, and thus do not support a similar conclusion, namely, that police conduct reflected a "calculated endeavor to secure a confession through the pressure of unrelenting interrogation." *Id.* at 54.

## II.   Claim 2 – Destruction of Evidence

In his next habeas claim, Sykes argues that the Chicago Police Department's destruction of five lots of evidence denied him his due process rights and that the Illinois Appellate Court unreasonably applied Supreme Court authority in deciding otherwise. Included in these evidence lots were a blood-stained bag with Girl X's boot on it, two markers, James Alexander's clothing, a mop head that Alexander used to clean his apartment, and Alexander's blood standards.[2]

The United States Supreme Court has held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). When differentiating claims based on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and destruction of evidence claims, the *Youngblood* Court explained that the difference "stems from our unwillingness to read the

---

[2] Sykes concedes that Alexander's blood standards can be replicated. (R. 4-1, Memorandum of Law in Support of Habeas Corpus, at 21.)

'fundamental fairness' requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* (internal citation omitted). In a subsequent case, the Supreme Court has reaffirmed its holding that the police do not have an absolute duty to retain significant evidence. *See Illinois v. Fisher*, 540 U.S. 544, 548, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004) (per curiam) (even if evidence is "essential to and determinative of the outcome of the case," due process clause not violated absent showing of bad faith). In *Fisher*, the Supreme Court refused to recognize an exception to the *Youngblood* bad faith requirement where evidence was destroyed in violation of a discovery request. *Id.*

Following *Youngblood* as precedent, the Illinois Appellate Court determined the following:

> In the case at bar, within a few hours of the attack on Girl X, the police collected over 150 pieces of evidence during their investigation, including the victim's boots, a brown paper bag spattered with reddish-brown stains, and two markers. The boots were examined in January 1997, and no blood or other stains were found on them. The paper bag was tested for fingerprints and the presence of blood in January 1997, and although the test indicated that human blood was present, there were insufficient DNA markings to identify the source of that blood. A portion of one of the stains from the bag was again tested in August 2000, using a more advanced test, which again yielded an inconclusive result. The markers were also tested for fingerprints in January 1997 with inconclusive results.

> Defendant was arrested in April 1997, and his initial discovery request was filed on May 16, 1997. On June 20, 1997, in response to a defense motion, the trial court entered an order that all evidence collected in the case was to be maintained. However, all of the aforementioned evidence was destroyed pursuant to police procedure between January and April 2000.

> Defendant subsequently filed two motions to dismiss the case, one on October 16, 2000 (while represented by the Cook County public defender), and one on December 13, 2000 (filed by current counsel). Both motions requested the dismissal of the case as a discovery sanction for the State's destruction of

evidence in the case.

In denying defendant's motion, the trial court found that the destroyed evidence was not potentially useful or evidence of the crime itself which would determine the outcome of the case. The court ruled that because the destruction of the evidence was inadvertent and not done in bad faith, there was no due process violation. The trial court did, however, grant defendant's motion to give a jury instruction allowing the jury to draw a negative inference from the State's lack of physical evidence:

> If the People have failed to offer evidence within its power to produce, you may infer that the evidence would be adverse to the People if you believe each of the following elements:
>
> 1. The evidence was under the control of the People and could have been produced by the exercise of reasonable diligence.
>
> 2. The evidence was not equally available to the defendant.
>
> 3. A reasonable prudent person under the same or similar circumstances would have offered the evidence if he believed it to be favorable to him.
>
> 4. No reasonable excuse for this failure has been shown.

While defendant characterizes the destroyed evidence as "critical," the record does not support that characterization. The record clearly establishes that every test available to be performed on the evidence was done, and inconclusive results were yielded. Thus, the destroyed evidence neither incriminated nor exonerated defendant, and we are presented with the scenario in *Youngblood,* where the evidence can at best be described as potentially useful. In such a case, a defendant must demonstrate bad faith on the part of the prosecution, which he has failed to do. The court found that the destruction of the evidence was due to a bureaucratic snafu, and we will not disturb that finding. It follows then that the trial court did not err in requiring a showing of bad faith before declaring a due process violation.

*People v. Sykes*, 341 Ill.App.3d at 969-71 (footnote omitted).

Based on this analysis, the Illinois Appellate Court reasonably applied *Youngblood* to the facts and circumstances of the case. The *Youngblood* standard is premised on the police's failure to preserve potentially useful evidence. *See id.* at 57-58. Here, the Illinois court explained that

the police tested the paper bag, the markers, and Girl X's boots and the tests were inconclusive. The record further reveals that the crime lab tested Alexander's clothes and mop with similar inconclusive results. Despite Sykes' argument that the evidence was potentially exculpatory, the destroyed evidence did not have evidentiary significance because it did not incriminate or exonerate Sykes. The Illinois Appellate Court also concurred with the trial court's conclusion that the destruction of the evidence was not done in bad faith, but through an inadvertent bureaucratic "snafu," despite the trial court's order that all physical evidence be maintained.

Nevertheless, Sykes contends that the Illinois Appellate Court failed to recognize that the Chicago police had an "undifferentiated and absolute duty to retain" the evidence because the trial court ordered the State to maintain the evidence after Sykes filed a discovery motion. The Supreme Court's decision in *Fisher*, however, undermines Sykes' contention that the trial court's order created an absolute duty to retain the evidence. *Id*. at 548. Indeed, the *Fisher* Court reasoned that such a per se rule concerning discovery requests would negate the purpose of the bad faith requirement, which is to limit "the extent of the police's obligation to preserve evidence to reasonable grounds and confin[e] it to that class of cases where the interests of justice most clearly require it." *Id*. at 548 (quoting *Youngblood,* 488 U.S. at 58).

Finally, Sykes does not provide any legal authority, let alone clearly established Supreme Court precedent, supporting his argument that "the violation of a court order directing the preservation of evidence clearly constitutes bad faith." (R. 4-1, Memorandum of Law in Support of Habeas Corpus, at 20.) Relying on the *Youngblood* and *Fisher* decisions, the Seventh Circuit recently articulated that destruction of evidence "raises problems only when the evidence was made scarce in order to undermine a valid defense." *United States v. Lee,* 399 F.3d 864, 865 (7th

Cir. 2005).  Such is not the case here.

## III.    Claim 3 – Sixth Amendment Rights

In his next claim, Sykes contends that the trial court's denial of his motion to have an expert perform a cognitive and physical examination of Girl X violated his right to confront witnesses and present evidence in his own defense under the Sixth Amendment.[3]

### A.    Confrontation Clause

Sykes bases his confrontation clause argument on the fact that his counsel was forced to communicate with Girl X on cross-examination using the "eye gaze" system that required time and experience to learn.  As such, without expert assistance, Sykes argues that his attorney was unable to fully and thoroughly conduct cross-examination of Girl X.  Sykes contends that he needed an expert to conduct such a cognitive and physical examination in order to determine if Girl X could communicate independently using the "eye gaze" system.

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The right of cross-examination is more than a desirable rule of trial procedure.  It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.'"  *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (citation omitted).  The right to cross-examination, however, is not absolute.  *Id.*  Trial courts have wide latitude "to impose reasonable limits on such cross-examination based on concerns

---

[3] Sykes does not address the Illinois Appellate Court's opinion concerning his Confrontation Clause claim.  Under the AEDPA standard, the Court reviews the last state court to make a merits determination, thus the Court reviews the Illinois Appellate Court's opinion as it pertains to Sykes' Sixth Amendment claims, not the Circuit Court of Cook County's decision.  *See Sanders v. Cotton,* 398 F.3d 572, 579 (7th Cir. 2005).

about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Brock,* 417 F.3d 692, 699 (7th Cir. 2005) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

In discussing Sykes' argument concerning the trial court's denial of his motion to have an expert perform a cognitive and physical examination of Girl X, the Illinois Appellate Court stated:

> There was, however, extensive testimony regarding the method that Girl X used to communicate, an eye gaze system, due to the extensive nature of her injuries. By using that system and an interpreter, the victim was able to testify in court. Defendant does not argue that the victim did not meet the tests of legal competency, only that her injuries made it difficult to cross-examine her. However, a witness's inability to speak does not render her incompetent to testify or violate the defendant's right to cross-examine witnesses so long as she is able to communicate the facts by other methods and otherwise meets the tests of legal competency. Girl X was able to testify using the eye gaze system, and once the system was explained, the record demonstrates that everyone, including defense counsel, was able to discern the victim's answers based upon the use of that system. Therefore, we find that the trial court did not err in denying defendant's motion to allow a defense expert to conduct a physical and cognitive examination of the Girl X.
>
> ....
>
> Girl X had a great capacity for communication in that she was able to utilize a communication system called the eye gaze system, which allowed her to spell out words using the letters of the alphabet. Because she was able to communicate by other means and was otherwise competent, we reject defendant's contention that his constitutional right to confront witnesses was violated.

*People v. Sykes*, 341 Ill.App.3d at 973 (internal citation omitted).

As the Illinois Appellate Court recognized, Sykes had the opportunity to cross-examine Girl X, albeit through the eye gaze system, and the trial court's denial of an expert examination did not impede this opportunity. The eye gaze system may have been difficult, as Sykes

suggests, but it did not limit the effective cross-examination of Girl X. Counsel could still impeach Girl X, test her perceptions and memory, and delve into her story. *See Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (complete limitation of cross-examination violates Sixth Amendment). Furthermore, because Sykes did not dispute Girl X's legal competency, the relevancy of a cognitive and physical examination was called into question. *See Van Arsdall,* 475 U.S. at 679 (trial courts have wide latitude to exclude marginally relevant evidence).

Finally, although an expert's ability to perform a cognitive and physical examination of Girl X may have been helpful, the denial of Sykes' request did not violate his Sixth Amendment right simply because he was denied his preferred method of challenging the eye gaze system. "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam).

As the *Yarborough* decision instructs, if a constitutional rule is general, state courts have more leeway in reaching an outcome. *Id.* at 664. Rulings on Confrontation Clause claims are not only fact-specific, but involve case-by-case determinations, "making it very difficult to call a state court ruling in this area 'objectively unreasonable.'" *Walker v. Litscher*, ___ F.3d ___, No. 05-1009, 2005 WL 2077515, at *6 (7th Cir. Aug. 30, 2005). As such, based on its fact-specific analysis, the Illinois Appellate Court's decision was an objectively reasonable application of clearly established Supreme Court precedent.

**B.     Compulsory Process Clause**

Sykes also argues that the trial court's denial of his motion to examine Girl X violated his right to present a defense because a defense expert would have offered highly relevant testimony regarding the reliability of the eye gaze technique and the possibility that the questioner could influence a child using this technique. Based on this argument, Sykes contends that the Illinois Appellate Court's decision was "contrary to" clearly established Supreme Court precedent as embodied in *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

The Sixth Amendment's Compulsory Process Clause recognizes the right of a criminal defendant to present evidence in his own defense. *Chambers,* 410 U.S. at 302; *see also Washington v. Texas*, 388 U.S. at 18-19. As the *Washington* Court explained, a defendant is denied his right to present a defense when the State arbitrarily denies him the opportunity to present a witness who is physically and mentally capable of testifying and whose testimony would have been relevant and material to the defense. *Id.* at 23. The right to present a defense, however, is not unlimited and is subject to reasonable restrictions. *See Chambers,* 410 U.S. at 302. "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.*

The Illinois Appellate Court concluded that because due process does not require an expert examination of a witness by the challenging party, the denial of Sykes' motion to examine Girl X did not violate Sykes' right to present a defense. *See People v. Sykes*, 341 Ill.App.3d at 973. Indeed, the trial court's denial of Sykes' motion did not prevent Sykes from retaining an expert to research the eye gaze system and offer an opinion on the reliability of the technique, including whether questioners might influence a child using the technique. Instead, the trial

court denied Sykes the opportunity to have an expert examine Girl X and then testify.

Under these circumstances, the trial court did not arbitrarily deny Sykes the right to call an expert witness on his behalf as prohibited by the Supreme Court's decision in *Washington v. Texas*. *See id.* at 23. As discussed, Sykes did not challenge Girl X's competency to testify, but instead argued that the eye gaze system was difficult and that the questioners could possibly manipulate Girl X's answers. A defense expert could have addressed these concerns without performing a cognitive and physical examination of Girl X. Therefore, Sykes' argument that the Illinois Appellate Court's decision was "contrary to" clearly established Supreme Court precedent fails.

## IV. Claim 4 – Sufficiency of the Evidence

In his last habeas claim, Sykes contends that the evidence presented at trial was insufficient to support his conviction because the State did not present any physical evidence linking him to the crimes.[4]

When assessing a sufficiency of the evidence claim, the reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, ***any*** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). The standard under *Jackson* "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

---

[4] In support of his sufficiency of evidence claim, Sykes also rehashes his arguments concerning the eye gaze system and the involuntariness of his confessions. Because the Court has rejected these arguments, they do not support the conclusion that the Illinois Appellate Court unreasonably applied *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to the facts of this case.

inferences from basic facts to ultimate facts." *Id.* Courts defer to a jury's credibility determinations and will overturn verdicts only if "the record contains no evidence, regardless of how it is weighed, upon which a rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Cummings,* 395 F.3d 392, 397 (7th Cir. 2005) (citation omitted).

In examining Sykes' sufficiency of the evidence claim, the Illinois Appellate Court concluded:

> Viewing the evidence in the light most favorable to the State, we find that the evidence was sufficient to support defendant's convictions. The evidence presented at trial, including defendant's own statements and the victim's testimony, established that Girl X had been sexually assaulted, strangled, and poisoned with roach spray on January 9, 1997, by defendant. The evidence also established that the attack occurred in the apartment where defendant resided with his then girlfriend as the victim was on her way home from an overnight visit with a friend. At the time of the attack, the victim was 9 years old, and defendant was 26. Defendant claims that no physical evidence linked him to the scene; however, it was he who identified the contents of the victim's stomach as TAT roach spray during his confession, which was found both in the apartment where defendant lived at the time of the attack and in apartment 205, which is where one of defendant's statements indicated that he threw the can after the assault. Prior to his confession, the police were unable to determine the nature of the contents of the substance in Girl X's stomach, other than it was a petroleum distillate. After the confession when the police located the can where defendant told them it would be, the contents matched the substance that Girl X had been forced to ingest.

> Moreover, the jury was instructed on the lack of physical evidence and that it could make a negative inference towards the State due to that lack of physical evidence. Defendant also refers to the "poor" quality of the victim's testimony as rising to the level of reasonable doubt. The trial court concluded, and we agree, that the victim was competent to testify, and the jury was in the best position to observe her demeanor and ability to communicate as she testified and to weigh the evidence, which was not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt.

*People v. Sykes*, 341 Ill.App.3d at 982-83.

The Illinois Appellate Court's decision is an objectively reasonable application of clearly

established Supreme Court precedent.[5]  Despite Sykes' argument that there was no physical evidence linking him to the allegations, the Illinois court recognized that the roach spray Sykes mentioned in his confession linked him to the crime because the spray's ingredients matched the contents of Girl X's stomach.  Furthermore, the trial court instructed the jury on the lack of physical evidence allowing the jury to make an inference in Sykes' favor.

In addition, the record reflects that the State presented substantial evidence supporting Sykes' guilt, including the testimony of Girl X, ASA Buckley, and certain police detectives, in addition to Sykes' confessions.  It was the jury's role, not the court's, to weigh the evidence and make credibility determinations.  As such, Sykes has not convinced the Court that the Illinois court's determination was objectively unreasonable and that the jury's verdict should be overturned.  *See Woodford v. Visciotti,* 537 U.S. 19, 25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (habeas petitioner has burden of proof to establish state court's application of Supreme Court law was unreasonable).

---

[5]  The Court notes that state courts are not required to cite Supreme Court case law "so long as neither the reasoning nor the result of the state-court decision contradicts" Supreme Court precedent.  *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

## CONCLUSION

For these reasons, the Court denies Sykes' petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254.

Dated: September 22, 2005

**ENTERED**

**AMY J. ST. EVE**
**United States District Judge**